OPINION.
{¶ 1} Defendant-appellant Darron Finch appeals from his conviction and sentence on two counts of Felonious Assault. Although he does not deny having stabbed his victim, twice, he contends that the jury's failure to have found in his favor on his defense of self-defense is against the manifest weight of the evidence. We conclude that his conviction is not against the manifest weight of the evidence. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 2} Some time in April, 2001, Marcus Dancy, the stabbing victim, purchased a dinette set from Finch for $50. At that time, Dancy had temporary access to a truck, and was going to use that to transport the dinette set. Other than some small bills, Dancy had no bills less than $100, so he gave Finch a $100 bill, upon the understanding that he would be back later for $50 in change, since Finch did not then have $50.
 {¶ 3} It had been Dancy's understanding that Finch was going to cut two customers' hair, and that, upon Dancy's return, with some straight razors, Finch would cut Dancy's hair. When Dancy returned, however, Finch was not at home. Dancy began periodically pressing Finch for payment of the $50, at first by telephone, and later by coming to Finch's home. At one point, Finch made a partial payment. There is some dispute about the amount, because of a contrary indication in a police report, but Dancy testified that the partial payment was $5, leaving a balance of $45. Even according to the police report, which the testifying officer, William Elzholz, testified was probably in error, any payment or payments that had been made were only partial, so that there was a balance owing on the $50.
 {¶ 4} In any event, matters came to a head on May 1, 2001, when Dancy found Finch at home. Dancy testified that the emotional context of the discussion about the debt Finch owed him escalated when Dancy saw someone give Finch some money, and Finch calmly put the money in his pocket, without offering to pay any of it to Dancy. Dancy testified that Finch seemed to become aware of Dancy's mounting anger, and attempted to get out of Dancy's immediate presence. Dancy tried to block Finch, and a scuffle ensued. Dancy wound up pinning Finch on the garage floor, but made no effort to hit him.
 {¶ 5} Scott Lyttle, a mutual friend of both Finch and Dancy, had ridden over to Finch's home with Dancy. According to both Dancy and Lyttle, Lyttle succeeded in defusing the situation to the extent that Dancy let Finch up. Finch then went into the house. There is some conflict in the testimony concerning whether Dancy followed Finch into the house. In any event, it is clear that both Finch and Dancy were later in the garage, after Finch went into the house. Lyttle, Finch's sole witness, testified what then happened, as follows:
 {¶ 6} "Q. Then you've got them both going in to the house, and they're in there for seconds, minutes, hours, how long?
 {¶ 7} "A. Seconds.
 {¶ 8} "Q. And who comes out the house first?
 {¶ 9} "A. Marcus [Dancy] backs out the house.
 {¶ 10} "Q. Marcus is backing out of the house?
 {¶ 11} "A. (Nods).
 {¶ 12} "Q. And are there steps coming out of that house?
 {¶ 13} "A. Not from — yeah, there's steps from the kitchen to the doorway, but from there —
 {¶ 14} "Q. Okay. Out of the house, are there steps coming out of the house?
 {¶ 15} "A. I mean, it's flat from — there's steps from the kitchen to the —
 {¶ 16} "Q. Sir, are you confused by the question?
 {¶ 17} "A. No, there's no steps.
 {¶ 18} "Q. Thank you. He's backing out of the house?
 {¶ 19} "A. Yes, out of the garage, from the door.
 {¶ 20} "Q. Well — okay. Out of the door?
 {¶ 21} "A. That leads from the garage to the house.
 {¶ 22} "Q. I don't want to confuse you. Let's back up. According to you, they're both in the house.
 {¶ 23} "A. Yes.
 {¶ 24} "Q. And then they come out of the house?
 {¶ 25} "A. Right.
 {¶ 26} "Q. Are we in the same location now?
 {¶ 27} "A. Yes.
 {¶ 28} "Q. Marcus comes out first?
 {¶ 29} "A. (Nods).
 {¶ 30} "Q. That's what you just said?
 {¶ 31} "A. Yes. He backs out of the house.
 {¶ 32} "Q. And he backs out of the house?
 {¶ 33} "A. Yes.
 {¶ 34} "Q. And there is no step?
 {¶ 35} "A. I mean —
 {¶ 36} "Q. Yes or no?
 {¶ 37} "A. No.
 {¶ 38} "Q. Then Darron comes next?
 {¶ 39} "A. Yes.
 {¶ 40} "Q. And Darron is facing him?
 {¶ 41} "A. Yes.
 {¶ 42} "Q. And Darron has a knife in his hand?
 {¶ 43} "A. Yes.
 {¶ 44} "Q. And what is Marcus doing?
 {¶ 45} "A. He backed up into the — in front of the garage.
 {¶ 46} "Q. And as he's backing up into the front of the garage, how quickly is he doing this?
 {¶ 47} "A. Not fast enough.
 {¶ 48} "Q. Why do you say that?
 {¶ 49} "A. Because he should have been — well, I mean, if it was me, I'd have been running.
 {¶ 50} "Q. Okay. But it wasn't you, so what did Marcus do?
 {¶ 51} "A. He was backing up real slow.
 {¶ 52} "Q. And what is Darron [Finch] doing while Marcus is backing up real slow?
 {¶ 53} "A. He was telling him to leave.
 {¶ 54} "Q. And what is Darron doing with the knife?
 {¶ 55} "A. He was holding it.
 {¶ 56} "* * *
 {¶ 57} "Q. What happens next?
 {¶ 58} "A. Well, he's telling him to leave, telling him to leave.
 {¶ 59} "Q. No, in terms of how he's —
 {¶ 60} "A. So he —
 {¶ 61} "Q. Only one of us can talk at once, okay.
 {¶ 62} "In terms of how he's using the knife at that moment, tell us.
 {¶ 63} "A. Oh, how he was using. He was holding it in his hand like (indicating), you know, holding it. I mean, using it as far as — he stabbed him with it.
 {¶ 64} "Q. You know, this is so important. Do you know why this is important?
 {¶ 65} "A. Yes.
 {¶ 66} "Q. Why?
 {¶ 67} "A. I mean, because it's a case. I mean —
 {¶ 68} "Q. Because it's a stabbing case, right?
 {¶ 69} "A. Yeah, he got stabbed.
 {¶ 70} "* * *
 {¶ 71} "A. And keep it in your hand, please. And now I have come to the side of the witness' back.
 {¶ 72} "I'm going to ask you to pretend that I am in fact Marcus, you are in fact Darron, and you can swivel your chair, and if you need to stand you can do that as well. Show us once more how he's using the knife at that point.
 {¶ 73} "A. He's holding it (indicating).
 {¶ 74} "Q. And for the record then, he's holding it pointing at Marcus, slightly downward?
 {¶ 75} "A. Yes.
 {¶ 76} "Q. Thank you. Now, while he's doing that, what is he saying to Marcus?
 {¶ 77} "A. Leave.
 {¶ 78} "Q. How was he saying that?
 {¶ 79} "A. Just go, just leave.
 {¶ 80} "Q. Is he saying it the way you're telling us right now?
 {¶ 81} "A. Exactly.
 {¶ 82} "Q. Very calmly?
 {¶ 83} "A. I mean, not calmly. He was like just leave, just leave, just go.
 {¶ 84} "Q. And what are you doing at this point?
 {¶ 85} "A. I'm saying the same thing.
 {¶ 86} "Q. And so Marcus continues to back up slowly; is that right?
 {¶ 87} "A. He stopped backing up at that time. They was in the driveway.
 {¶ 88} "Q. And so from the door of the house to the driveway —
 {¶ 89} "A. Not the door of the house, the garage door, the door that leads into the garage.
 {¶ 90} "* * *
 {¶ 91} "Q. From the door of the house where Marcus is backing out of the house, according to you, he continues to back until he reaches the driveway?
 {¶ 92} "A. Yes.
 {¶ 93} "Q. What makes him stop?
 {¶ 94} "A. I don't know.
 {¶ 95} "Q. What did you see that would be reasonable to believe made him stop?
 {¶ 96} "A. I don't know why he stopped.
 {¶ 97} "Q. When he stopped, was Darron still in front of him?
 {¶ 98} "A. Yes.
 {¶ 99} "Q. Still holding the knife?
 {¶ 100} "A. Yes.
 {¶ 101} "Q. And where were you then?
 {¶ 102} "A. In back, right in the back of them.
 {¶ 103} "Q. Right in back of who?
 {¶ 104} "A. Of Marcus. He was like — he was backed out. He was backed out like the garage. He came out that — Darron came out the house in front of him, and I was in the back. I was in the driveway.
 {¶ 105} "Q. What happens next?
 {¶ 106} "A. Well, they — that's when the stab started. I mean, that's when he stabbed him.
 {¶ 107} "* * *
 {¶ 108} "Q. Tell us what happens at this point where you all are in the driveway.
 {¶ 109} "A. Well, he's telling him to leave. He has the knife. Marcus didn't leave, and he was backing up. He started backing up some more, but some kind of way he got turned around because he wasn't backing towards me down towards the driveway towards the car, he was backing towards like the house, or the next-door neighbor's house like, you know. He backed up, and that's what — I mean, he was backing up and that's when he got stabbed. He was telling him to leave. He got stabbed. Then he fell. That's when he was backing up some more and he fell over the toolbox and got stabbed. And that's what happened.
 {¶ 110} "* * *
 {¶ 111} "Q. On direct examination you said that Darron told Marcus to go but he wouldn't leave, and isn't it true he didn't have a chance to because he got stabbed?
 {¶ 112} "A. He had a chance to leave, but I guess he didn't — I guess he didn't leave quick enough.
 {¶ 113} "Q. And exactly what was Marcus doing that caused him to get stabbed once he was on the ground?
 {¶ 114} "A. I couldn't tell you that.
 {¶ 115} "Q. Why not?
 {¶ 116} "A. I mean, he wasn't doing nothing."
 {¶ 117} Dancy was stabbed twice. Dancy was nevertheless able to get back into the car he was driving and drive himself to the hospital. At the entrance to the emergency room, he got out of the car, collapsed, and was treated for his injuries. There was medical testimony concerning the extent of his injuries, which were serious.
 {¶ 118} Finch was arrested and charged with two counts of Felonious Assault. Following a jury trial, Finch was convicted, and sentenced accordingly. From his conviction and sentence, Finch appeals.
 II {¶ 119} Finch's sole assignment of error is as follows:
 {¶ 120} "Defendant-appellant's conviction is against the manifest weight of the evidence."
 {¶ 121} Finch contends that the jury's failure to have found for him on his defense of self-defense is against the manifest weight of the evidence. The jury was instructed on the issue of self-defense, and the parties argued this issue. To establish the defense of self-defense, a defendant must prove, by a preponderance of the evidence, that: (1) he was not at fault in starting the affray; (2) he had a bona fide belief that he faced imminent danger of death or great bodily harm; and (3) he did not violate any duty to retreat or avoid the danger. State v.Jackson (1986), 22 Ohio St.3d 281, 490 N.E.2d 893, citing State v.Robbins (1979), 58 Ohio St.2d 74, 388 N.E.2d 755.
 {¶ 122} The State contends that Finch "failed to adequately prove" the second and third elements. Finch contends that he had no duty to retreat, because the confrontation occurred in his home.
 {¶ 123} Finch also contends that he had reasonable grounds to believe that he was in imminent or immediate danger of death or great bodily harm. The jury might reasonably have found against Finch on this issue. Both Dancy and Lyttle, Finch's sole witness, testified that Dancy had let Finch up from the garage floor, after pinning him. A jury could reasonably conclude from this evidence, as well as from Dancy's and Lyttle's testimony that Dancy was backing up, and was not presently menacing Finch in any way when Dancy was stabbed, that a reasonable person in Finch's position would not have believed that he faced imminent danger of death or great bodily harm. Accordingly, we do not find that the jury lost its way in finding against Finch on this issue.
 {¶ 124} Finch's sole assignment of error is overruled.
 III {¶ 125} Finch's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
WOLFF and GRADY, JJ., concur.